**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 25-cr-222-WJM-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.

2.    COBY VANCE GOLDSMITH,

    Defendant.

---

**ORDER REVERSING MAGISTRATE JUDGE'S DETENTION ORDER**

---

Defendant Coby Vance Goldsmith appeals ("Appeal") Chief Magistrate Judge Scott T. Varholak's pretrial detention order, urging the Court to immediately release him "from custody pursuant to the Bail Reform Act and Fifth Amendment's Due Process Clause." (ECF No. 45.) The Government filed a response, to which Goldsmith filed a reply. (ECF Nos. 57, 58.) Although a decidedly close question, the Court reverses Judge Varholak's detention ruling and orders that Goldsmith be immediately released, subject to the conditions outlined below.

**I.    BACKGROUND**

On July 7, 2025, the Government charged Goldsmith, Devonta Reginald Smith, and Dantie Terrel Williams (collectively, "Defendants") with attempted bank robbery and aiding and abetting the same, 18 U.S.C. §§ 2113(a) and 2. (ECF No. 1.) On July 15, 2025, Judge Varholak held a hearing on the Government's motion for Defendants to be detained pretrial. (ECF No. 24.) At the hearing, the Government summarized that this

case is about "an [automated teller machine ("ATM")] tech robbery, an attempted ATM tech robbery."  (ECF No. 57-1 at 8.)   The Government averred that the crimes are "commonly committed by Houston crews using heavily tinted stolen or rental cars with switched-out plates."  (*Id.*)   It explained:

> What they do is they typically, and is, as you'll hear, is the case here, and last year, the Government is proffering that these defendants arrived from Houston.   They put what I'm calling sticky cards, which is cards with glue in them, glue on them into the ATM to jam the ATM for the purpose of luring the ATM tech to fix the machine.
>
> And when the ATM is popped open, they run at the ATM tech, intimidate him, shove him, or otherwise intimidate him to move out of the way and then take the cassettes inside the ATM, which also have a—often have a tremendous amount of money.

(*Id.* at 8–9.)

The Government alleged that Defendants completed this style of bank robbery at a Wells Fargo ATM location in Centennial, Colorado on April 3, 2025, ultimately stealing $290,782.   (ECF No. 57 at 2; ECF No. 1 at 4, 6.)   It further alleged that Defendants attempted to complete this same style of bank robbery at another Wells Fargo ATM location in Arvada, Colorado on July 3, 2025, but were apprehended by law enforcement before they were able to do so.   (*Id.*)

According to the Government, Goldsmith committed these crimes while he was released "on an $85,000 state bond for an identical ATM technician bank robbery committed in South Carolina in 2023."   (*Id.* (citing ECF No. 29).)   The Government added that, after Defendants were arrested, law enforcement found several incriminating items in their car, including "a package of Green Dot cards exactly like the card that had jammed the Wells Fargo ATM"; "a top of a glue bottle which indicated that

there was a glue bottle in the car"; license plates from another vehicle Defendants had allegedly used in a prior bank robbery; gray gloves that had been "worn by the individual in the [surveillance] video" captured from the April 2025 robbery; "$1,500 cash found on al the individuals collectively"; "a cash counting machine" "in the trunk of the vehicle"; and "a bag of COVID masks and two balaclavas." (ECF No. 57-1 at 10–12.) It observed that investigators found pictures of Defendants posing with "large amounts of cash" on their social media pages. (*Id.* at 13.)

The Government acknowledged that "probation is not recommending detention as to Mr. Goldsmith . . . ." (*Id.* at 15.) It speculated that probation took this position because Goldsmith is "only 20 years old" and "because of his criminal history, which he does not have significant previous felony convictions like the other two defendants." (*Id.*) The Government also concurred that Goldsmith "doesn't have this long juvenile or adult history." (*Id.*) Nevertheless, it emphasized that the "very serious crimes that have either been charged or we're proffering were committed by him since the age of 18 years old." (*Id.*) The Government was seemingly alluding to two prior criminal incidents allegedly involving Goldsmith: an evading arrest juvenile charge, which the parties agree never resulted in a conviction (ECF No. 57 at 11 n.4), and a "May 2023 Myrtle Beach charge," which allegedly involved "a strong-arm robbery and conspiracy to commit strong-arm robbery." (ECF No. 57-1 at 15.) As to the South Carolina case, the Government elaborated:

> This is from the contacting Myrtle Beach law enforcement and also reading a press release released by Myrtle Beach law enforcement. On May, the allegations in Myrtle Beach is that on May 30th, 2023, the ATM was jammed by several individuals who are noted to be from Houston, Texas.

3

> The reports are that three black men ran at an ATM tech screaming, 'Get on the ground.'  They stole three ATM cassettes with a significant amount of money.
>
> They're described as a Houston robbery crew that includes Coby Goldsmith and individuals named Corey Gordon, Darius Randall, Benjamin Robinson, and Jasmine Long, who I can tell the Court was a suspect in a 2022 robbery that—where I indicted a codefendant.
>
> He bonded out in February, on February 14th, 2023.  I don't know the conditions of those bond—of that bond, Your Honor, but I certainly believe as an officer of the Court that they don't include traveling around the United States and robbing ATM techs.
>
> So while on bond, he rented a vehicle in 2024 in Houston, Texas.  And Your Honor has already heard the description of the Wells Fargo ATM robbery on April 2nd, 2024.  He rented another vehicle on June 30th, 2025, and he was caught driving a vehicle with a switched-out plate and no front plate, a covered VIN, and really all the accompanying items of an ATM tech robbery.
>
> He was arrested then on July 3rd, 2025.  So what we have, Your Honor, is, I believe, strong evidence of—I can't speak to the South Carolina case, but it is charged—of three—of two different significant ATM robberies using violence and one attempted ATM robbery.
>
> So, two of those three committed while he was on bond.  I think that context, Your Honor, shows that there's no combination of conditions that can reasonably assure his appearance or the safety of the community.  We believe that the community is in danger when Mr. Goldsmith is released on bond, cashless bond or otherwise.

(*Id.* at 16–17.)

Defense counsel countered that "the Government is relying mainly on the facts that they have spelled out in the complaint, facts that were available to probation when they drafted the presentence or, excuse me, the pretrial services report."  (*Id.* at 20.) Counsel stressed that probation recommended against detention despite knowing about

4

the evading arrest incident and the 2023 state case in South Carolina, pointing out that the latter case "has been pending since 2023, and it does not look like there has been any violation of the conditions." (*Id.*)  Judge Varholak interjected, "Well, other than allegedly committing the same exact crime . . . ." (*Id.*)  Defense counsel responded:

> That's correct, Your Honor.  And I think that's why probation recommended both home detention and a GPS monitoring.  Those are things that we would—that the Court would be able to monitor where he is at and where he is going.
>
> I will note as well that we have spoken with Mr. Goldsmith's mother.  She is willing to be a third-party custodian in this case should the Court grant him a bond.  She would come up here.  At that point, she could sign the paperwork for the Court.
>
> But these are facts that the probation officer knew and still recommended release on those conditions.  I would also note, Your Honor, that looking—focusing just on the facts in and of itself, I don't believe is enough to look at what—whether there are conditions.
>
> If those facts are true, there are still conditions that could be set, the conditions identified by probation.  I'll note he does have strong family support.  The Court has seen the letters that I filed that include not only his family, but a family friend that is involved.
>
> He does work with his stepfather, and, yes, it is manual labor, which is a little harder than what we do, I think.  He has the ability to work.  He has family ties in the Houston area.
>
> If he's put on home detention, he will be home.  His mom will be there to make sure that he's complying with the conditions of release.  All of those factors, I think, support the idea that Mr. Goldsmith should be released on conditions.

(*Id.* at 21–22.)

In the end, Judge Varholak issued the following ruling:

> Turning to Mr. Goldsmith, I note once again the seriousness of the instant offense and the fact that he really has no ties to this community.1   His record is certainly not anywhere near the same extent as Mr. Williams' is.
>
> But we do have the evading arrest with a vehicle as a juvenile.   Admittedly as a juvenile, but he's only 20 years old now.   So this was a mere four years ago when he had that adjudication.
>
> And then what is absolutely the most concerning to me is the fact that in 2023, he was arrested for virtually the second—the exact same offense as he's alleged to have committed now.   And he's under supervision for that offense.
>
> I don't know the terms of that supervision, but I can't fathom that they permit him to commit the same exact offense that he's on supervision for, and we have this.   And yes, his record is not as bad as Mr. Williams' is.
>
> And yes, if he had appeared in front of me without that offense in Myrtle Beach, and this was his first time being in trouble, perhaps I could find the conditions or combination or conditions to assure his presence.
>
> But he clearly didn't learn his lesson by his arrest at the age of 19.   Again, the evidence in this case is strong.   And therefore, I find that there are no conditions or combination of conditions that I can impose to assure his presence or the safety of the community, and I will therefore order him detained.

(*Id.* at 35–36.)

On July 22, 2025, a grand jury indicted Defendants for bank robbery and attempted bank robbery based on the April 2025 and July 2025 incidents.   (ECF No. 30.)   Goldsmith now appeals Judge Varholak's detention order.   (ECF No. 45.)

---

1 The Court acknowledges that Goldsmith seemingly does not have ties to the Denver community.   Still, the Court believes this is counterbalanced by his strong relationship with his mother, who will assume custody over him, and his stepfather, for whom he will be working.

6

## II.   APPLICABLE LAW

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno,* 481 U.S. 739, 755 (1987). Thus, under the Bail Reform Act, a defendant may be detained pending trial only if a judicial officer finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e); § 3142(b), (c).  The judicial officer may make such a finding only after holding a hearing according to the procedures specified in § 3142(f).  The Government bears the burden of proving risk of flight by a preponderance of the evidence and dangerousness to any other person or to the community by clear and convincing evidence.  § 3142(f).

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other

> release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

§ 3142(g).

Both defendants and the Government have the opportunity to appeal a magistrate judge's detention order to the district court judge.  § 3145(b).  The district judge reviews the magistrate judge's decision *de novo*.  *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003).

> *De novo* review, however, does not necessarily mean holding an evidentiary hearing.  Although a district court may start from scratch and take evidence, it may also review the evidence that was before the magistrate judge and make its own independent determination as to whether the magistrate judge's findings and detention order are correct.  This is a matter of discretion for the district court.

*United States v. Romero*, 2010 WL 11523871, at *2 (D. Colo. May 17, 2010) (internal quotation marks and citations omitted).[2]

### III.   ANALYSIS

Goldsmith contends that Judge Varholak erred by ordering that he be detained pretrial, arguing that the presumption of release, probation's related recommendation, and his lack of criminal history all counsel against detention.  (ECF No. 45.)  Although the Court believes that Judge Varholak reasonably concluded that the strength of the evidence against Goldsmith compelled imposing detention, § 3142(g)(2), the Court

---

[2] The parties do not ask for an evidentiary hearing and the Court concludes that one is not necessary to resolve this appeal, given the full development of the facts made at the detention hearing before Judge Varholak, the transcript of which this Court has carefully reviewed in full.

nevertheless concludes on *de novo* review that there is a combination of conditions—most notably, home detention with location monitoring—that will reasonably ensure that Goldsmith will appear for his court dates and not endanger the community. Accordingly, the Court reverses Judge Varholak's detention order.

The Court begins by acknowledging that several of the section 3142(g) factors amply support Judge Varholak's detention order. The Court begins with section 3142(g)(1), which pertains to "the nature and circumstances of the offense charged." This factor plainly supports affirmance. After all, the crimes for which Goldsmith is charged—in particular, completed bank robbery—are undisputedly crimes of violence. *See* § 3143(g)(1) (instructing courts to consider "whether the offense is a crime of violence"); s*ee also United States v. McCranie*, 889 F.3d 677, 681 (10th Cir. 2018) (holding that bank robbery is categorically a crime of violence).

Section 3142(g)(2), which pertains to the "weight of the evidence against the" defendant, likewise supports detention. According to the Government's evidence, surveillance video depicts Defendants completing bank robbery in April 2025 and attempting to complete the same offense in July 2025. *See United States v. Wanjiku*, 2023 WL 8368755, at *2 (10th Cir. Dec. 4, 2023) (concluding that the weight of the evidence was strong because it included "video footage"); *see also United States v. Zhe Zhang*, 55 F.4th 141, 150 (2d Cir. 2022) ("video surveillance" linking Defendant to the crime indicated "a strong case"). (ECF No. 57 at 6–7.) And this is to say nothing of the evidence law enforcement found in the vehicle in which Defendants were arrested. The Government sums up this evidence as follows:

> an electric money-counter in the trunk, the grey glove in the rear seat, $1500 cash, a stack of chime cards (like the ones

9

>used in the jammings), the top of a glue bottle, two balaclavas (like the balaclava worn by the driver in the jamming), a box of surgical masks, and hoodies. They also found the switched-out license plate that originally belonged on the rental car. Additionally, the Texas emissions sticker, which is required on every car in Texas, was removed to mask that the car was from Texas.

(*Id.* at 8.)

Section 3142(g)(4), which pertains to "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," further supports detention. It is not lost on the Court that Goldsmith allegedly committed or attempted to commit a series of bank robberies while he was on bond for similar (if not identical) charges in a prior case. Other courts have found such circumstances to be relevant to whether a defendant poses a danger to the community. *See United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (reasoning that "the risk that a defendant will continue to engage in drug trafficking," and by extension, any other serious crime, "constitutes a danger to the safety of any other person or the community") (internal quotation marks omitted); *see also United States v. Jackson*, 903 F.2d 1313, 1320 (10th Cir. 1990) (explaining that a defendant's "pattern of similar criminal activity" is indicative of the "likelihood of future crimes"); *see also Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public[.]").

All this to say, the Court believes that Judge Varholak reasonably concluded that pretrial detention was appropriate in these circumstances and that the Court would be acting well within its discretion to affirm that decision. Nevertheless, the presence of these countervailing factors does not ultimately convince the Court to depart from the

maxim that, "[n]ormally, individuals criminally charged are not subjected to pretrial detention." *United States v. Ortega-Lopez*, 2025 WL 1263710, at *4 (D.N.M. May 1, 2025) (citing *Salerno*, 481 U.S. at 755). The Court's mandatory consideration of the section 3142 factors is not a matter of arithmetic—it necessitates an individualized and subjective *weighing* of those factors. Weighing the factors *de novo*, the Court concludes that the general presumption of release, Goldsmith's lack of criminal history, and the fact that a court has not yet tried ordering him to submit to home detention collectively warrant pretrial release. Here is why.

First, Goldsmith points out that he enjoys the presumption of release under the Bail Reform Act. (ECF No. 45 at 4.) The Government does not argue otherwise, instead acknowledging that it bears the burden of overcoming this presumption either by the preponderance of the evidence (based on flight concerns) or clear and convincing evidence (based on safety concerns). (ECF No. 57 at 10.)

The Government attempts to overcome this presumption by relying almost exclusively on the strength of its evidence against Goldsmith. (*See generally id.*) Indeed, the Government doubles down on this theory on appeal, citing new incriminating evidence unearthed since Judge Varholak issued his detention ruling. (*Id.* at 8.) As discussed, the Court agrees that the strength of this evidence weighs against Goldsmith.

But by focusing so heavily on the strength of its evidence, the Government gives short shrift to Goldsmith's lack of criminal history. The Court, by contrast, places significant weight on this factor. Goldsmith has *not* been convicted of the bank robbery charge in the South Carolina case, and is presumed innocent of that charge until proven

11

guilty.   Moreover, there appears to have been some misgivings at the detention hearing as to whether Goldsmith's juvenile evading arrest charge resulted in an adjudication or conviction.   In reaching his detention ruling, Judge Varholak mentioned that "we do have the evading arrest with a vehicle as a juvenile."   (ECF No. 57-1 at 35.)   To the extent that this mere arrest contributed to Judge Varholak's detention decision, the parties have clarified on appeal that no conviction or adjudication resulted from that arrest; instead, that prosecution was apparently deferred and the case ultimately dismissed.   (ECF No. 57 at 11 n.4.)   In sum, then, Goldsmith has *zero criminal history*.

Relatedly, the Court declines the Government's invitation to fault Goldsmith for allegedly "associat[ing] himself with convicted felons" and being "charged with three bank robberies in two states" in the recent past.   (*Id.* at 10.)   The Court will instead consider only conduct that is itself criminal (not mere association with others) and for which Goldsmith has been convicted in conducting its section 3142(g)(3) analysis.

The Court is not alone in placing great weight on Goldsmith's lack of criminal history.   The Probation Office agreed that Goldsmith's lack of criminal history makes it unlikely that he would fail to appear for court dates or pose a safety risk to the community.   (ECF No. 29.)   Accordingly, the Probation Office recommended that Goldsmith be released pretrial subject to several conditions, including home detention with location monitoring.   (*Id.*)   Notably, the Probation Office's recommendation came despite knowing that Goldsmith had been and is charged with crimes in other cases. And significant to the Court's mind is the fact that, while Goldsmith surely violated the (undisclosed) terms of his probation in the South Carolina case by allegedly committing similar crimes in Colorado, he did so only after the South Carolina court had removed

12

the condition of GPS monitoring from his bond after he had abided by it for several months.  (ECF No. 45-1.)  In other words, up until the South Carolina court removed this condition, Goldsmith had apparently complied with the terms of his probation.  (*Id.*)

Hence, the Court believes that Goldsmith has demonstrated an ability to be successful when certain guardrails are put in place.  The Court is especially optimistic that imposing stricter location monitoring conditions will facilitate his success and the safety of the community here.  Consequently, the Court will require Goldsmith to submit to home detention as a condition of his pretrial release, consistent with the Probation Office's recommendation.

The Court notes that the Government does not argue in its response for why it believes home detention would be futile.  This condition also got very little airtime at the detention hearing, despite it being a critical part of the Probation Office's recommendation.  (*See generally* ECF No. 57-1.)  The Court is particularly troubled by the absence of the Government's input on this score, given that it's *the Government's* burden to prove that *no conditions or combination of conditions* of release will ensure Goldsmith's court attendance and the community's safety.

For these reasons, the Court shall impose the following conditions of release, *in addition to* all standard conditions of release imposed on defendants in these circumstances:

(1) Goldsmith shall post an unsecured appearance bond in the amount of $10,000;

(2) Goldsmith shall be placed in the custody of Kenya Steward, his mother, who agrees to (a) supervise him, (b) use every effort to assure his appearance at all court

proceedings, and (c) notify the Court immediately if he violates a condition of release or is no longer in her custody;

(3) Goldsmith must reside with Kenya Steward at 20907 Running Moon Trail, Humble, TX 77338;

(4) Goldsmith must submit and report to supervision in the Southern District of Texas (at the address provided by pretrial);

(5) travel is restricted to the Southern District of Texas and the District of Colorado for court purposes, absent prior approval from the Court;

(6) Goldsmith is restricted to his residence at all times except for employment, education, religious services, medical, substance abuse, or mental health treatment, court appearances, or other activities approved in advance by the pretrial services office; and

(7) Goldsmith shall submit to electronic surveillance/GPS monitoring.

## IV.    CONCLUSION

Accordingly, the Court ORDERS as follows:

1. The Appeal (ECF No. 45) is GRANTED, and the Magistrate Judge's detention order is REVERSED;

2. The Court ORDERS the IMMEDIATE RELEASE of Defendant Goldsmith;

3. The Court DIRECTS counsel for the Government, for the Defendant, the U.S. Marshal Service, and the Probation Office to use and coordinate their best efforts to effect the prompt release of Goldsmith; and

4. Upon release, Goldsmith shall be subject to ALL CONDITIONS set forth above in this Order.

Dated this 16th day of September, 2025.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge